No. 12,846.

MATTHEWS *v.* THE PEOPLE.
(3 P. [2d] 409)

Decided September 21, 1931.

Mr. GEORGE H. BLICKHAHN, for plaintiff in error.

Mr. CLARENCE L. IRELAND, Attorney General, Mr. ED-
WARD J. PLUNKETT, Assistant, for the people.

*En Banc.*

MR. JUSTICE BURKE delivered the opinion of the court.

PLAINTIFF in error, hereinafter referred to as defend-
ant, was convicted of the murder of his wife, and, as

determined by the verdict, sentenced to the penitentiary for life. To review that judgment he brings error and asks that the writ be made a supersedeas.

Of the five questions raised by the twenty assignments, but two require consideration, i. e., the sufficiency of the evidence and the correctness of the trial court's order overruling defendant's motion for a directed verdict.

A clear understanding of our conclusion that this verdict is unsupported requires a brief statement of the unusual facts presented by this record.

At the time of the transaction here involved, defendant was fifty-five years old, and for the past twenty-two years had been a resident of Walsenburg. During five years of that time he was a janitor at the county high school, thereafter for fourteen years a janitor at the First National Bank. During the two years immediately preceding his arrest he was a watchman at that bank. He and his wife were, at the time, living apart, and he had brought suit five months before for divorce on the ground of mental cruelty. He lived in rooms in the basement of the bank and his wife at a separate residence. When they parted he gave her everything he had, and his testimony that he felt no ill-will toward her is uncontradicted.

Mrs. Matthews resided in a four-room house, which she first occupied about the middle of May, 1930. On the evening of October 16 of that year she had visited a neighbor. She left there about 9 p. m., stopping for a few moments at the residence of another on her way home to get the evening paper. Failing to notice her about the premises the following morning, friends entered her house and found her lying on the floor, dead. She was dressed as she had been when last seen the previous evening, with the paper under her arm and her keys in her right hand. The place was in general disorder; a suitcase upset and its contents scattered, a box of papers thrown about, and the drawer of the telephone table

open. Three .38 caliber bullets had been fired into her body—all the indications being that she had been shot immediately upon entering her home the preceding evening. A deputy sheriff was called, who thereafter summoned a physician, who made an examination of the body and at the trial testified as to the cause of death. Some days thereafter, having ascertained that defendant probably owned a .38 caliber revolver, the deputy district attorney requested one of the bank officials to ask him to come to his office and bring the gun. This defendant did. At the time it was cleaned, oiled and fully loaded. Defendant frankly admitted the ownership and asserted that it had not been out of his possession.

The information herein was filed November 6, 1930; the defendant was arrested on the same day, and his trial began on the 16th of February following.

Aside from mere routine proof, the case of the people rested solely upon the testimony of a ballistics expert, who had examined the bullets taken from the body of the deceased, compared them with bullets which he fired from defendant's revolver, and gave it as his opinion that the murder was committed with that weapon.

Defendant tendered an alibi, supported by his own testimony and that of the witnesses Jones, Whitfield and James. Each corroborated the others and their story stands uncontradicted. That story is as follows:

One Tressler, a real estate dealer, had an office in the bank building. James had worked for him the preceding year, and for three or four months in the spring and early summer of 1930 had slept there. He was now living at Gardner but was in Walsenburg on the evening in question. He had known defendant for the past five years. Whitfield was janitor at the bank and lived some six blocks distant. Jones lived with him. On the evening of October 16, defendant helped Whitfield with his daily cleanup, finishing about seven o'clock. A little before that Tressler and James were in the former's office. Tressler

suggested that James stay there that night and volunteered to get him a key from defendant. This he did at seven o'clock. About the same time Jones came to defendant's room and was sent for some cigars. He promptly returned, accompanied by one Frank Williams. Just after defendant delivered the key to Tressler, Whitfield went home. Williams stayed until a little after eight. James went to a picture show and returned to Tressler's office about nine. He talked for ten or fifteen minutes with defendant at that time. Later he went for a lunch and came back about ten. He then called to defendant that the latter might know who was coming in and received an answer of recognition. Shortly thereafter Jones, who had heard Tressler get the key and had heard the conversation between defendant and James at nine o'clock and again at ten, went home. He arrived at Whitfield's place at twenty minutes past ten. He says that from the time of his arrival at the bank, a little before seven o'clock, until his departure, a little after ten, defendant did not leave the building.

If the evidence of the expert is true defendant's wife was killed with defendant's gun, and since during the time when the murder must have been committed the gun was in his possession his guilt is established. Against this testimony must be set defendant's long residence in the community, his unquestioned character, absence of motive and a perfect alibi. Under such circumstances, the testimony of this expert must be subjected to the most careful scrutiny. If veracity and credibility were the preponderating elements in that scrutiny, a well established rule would prevent our interfering with the conclusion of the jurors who saw and heard the witness, but such is not the situation presented. This witness explained to the court how such guns were made and how the bullets fired from them were often so marked by the grooves in the rifling as to make identification not only possible but indisputable. He did not, then, rest his conclusion upon his mere opinion that the bullets which

caused death came from defendant's weapon. He made a comparison of the two under a glass, in the presence of the jurors, and pointed out to them the identical markings upon which his opinion was based, so that the jurors were, presumably, as capable of seeing what he saw, and as irresistibly driven to his conclusion therefrom, as the witness himself. The force of his testimony depends therefore, upon the appearance of the alleged markings on the bullets in evidence. All these bullets are before us. Each of the Justices has examined them under a powerful glass (though not the identical one used at the trial), and has been wholly unable to see anything resembling what the witness says he saw and which he assumed to exhibit to the jurors. The rule applicable here is the identical rule applicable where all the evidence in support of a judgment is presented by deposition. This court is as capable of passing upon such evidence as the jurors who heard it. All the facilities they had we have. If it were alleged, for instance, that a certain assertion appeared in a deposition in such a case and that assertion were indispensable to support the judgment entered, and an examination of the deposition disclosed no such assertion, we would necessarily reverse the judgment. *Holbrook Irr. Dist. v. Fort Lyon Canal Co.*, 84 Colo. 174, 193, 269 Pac. 574.

Here the sole evidence of guilt is the assertion that certain alleged markings appear upon these bullets. We examine them and find nothing of the kind. Hence, the judgment must necessarily be reversed. The thread is entirely too slender to support a sentence of life imprisonment. The evidence is not only weak and uncertain; it is no evidence.

Under such circumstances defendant's motion for a directed verdict should have been sustained, and, since the case of the people derives no support from the case of the defendant, the judgment is reversed and the cause remanded with directions to the trial court to sustain defendant's motion and discharge him.