233 P.2d 437

STATE v. LANE.

No. 1009.

Supreme Court of Arizona.

June 25, 1951.

W. H. Chester, of Phoenix, for appellant.

Fred O. Wilson, Atty. Gen., Chas. Rogers, Asst. Atty. Gen., Warren L. McCarthy, Maricopa County Atty. and Robert H. Renaud, Deputy County Atty., all of Phoenix, for appellee.

UDALL, Chief Justice.

This appeal comes here from a retrial of the case of State v. Lane, 69 Ariz. 236, 211 P.2d 821, which this court reversed because of prejudicial error in the admission of hearsay testimony. In the first trial the defendant Charles E. Lane, Jr., was convicted and sentenced to life imprisonment for the murder of his ex-wife, Mary Alice

Johnson (Lane). In the second, from which this appeal is taken, the defendant was again convicted but was sentenced to death. He has appealed from the judgment and order denying his motion for a new trial, contending that his trial was not fair and impartial nor in accordance with law.

A synopsis of the salient features of the evidence must necessarily be based upon that adduced by the State, since the defendant did not testify nor were any witnesses called in his behalf. As near as it could be established the decedent met her death some time between 2 and 2:30 a. m. on February 10, 1948. She was last seen alive at approximately 2 a. m. by one Adam Goettel who delivered her to the house she occupied alone at 922 South 27th Avenue (two blocks north of Buckeye Road) in the city of Phoenix. Her body was discovered about 6 a. m. by her mother who lived nearby. The decedent was found partly undressed lying in a pool of blood on the floor near her undisturbed bed. She had been shot twice—one shot had entered her body through the right cheek, the other just below the chin. The lock on the front door to the house had been broken off; the door was slightly ajar, and the lights were still on.

The State necessarily depended upon circumstantial evidence to establish the actual shooting as there were no eyewitnesses whom it could call. However there was much direct evidence upon which the State relied which led to the inevitable conclusion that defendant was guilty of the premeditated murder of his ex-wife.

Defendant, age 30, a resident of the Phoenix area, had married the woman whom he has been convicted of murdering on October 15, 1946. The decedent had been previously married to Johnson, and had a three-year-old daughter as the issue of the first marriage. The marriage with defendant had been an unhappy union and the decedent had permanently left him some 30 days prior to their divorce, which the wife obtained on February 3, 1948. Defendant was extremely jealous of his wife and tried to force her to return to him. A witness testified that just ten days before the killing she overheard the defendant tell the decedent, "* * * If I can't have you I don't want anybody else. *Nobody else will have you either.*" (Emphasis supplied.)

In addition to the above the State relied upon the following facts and the inferences logically deducible therefrom: (1) the defendant had repeatedly threatened to kill his ex-wife, and one witness had heard him tell her, "When I told you I will kill you, I mean it."; (2) it was shown that as a result of these threats the decedent was in mortal fear of her life and had on at least three occasions appealed to the police for protection from him; (3) during the evening prior to the killing, after defendant had made two fruitless attempts to borrow a gun he finally succeeded in borrowing a .22 Winchester rifle from Mac

Ross, a friend; cartridges for the gun were borrowed from Jimmie Brown, another acquaintance, and both were told by defendant that he was going hunting the next day. The gun was never returned to the owner nor was the death weapon ever found; (4) a ballistics expert's testimony led to the conclusion that the fatal shots were fired from the Mac Ross rifle,—(More will be said of this evidence later); (5) a gray Plymouth sedan, bearing Arizona license plate number A/H, followed by three unknown numerals, was seen about 2 a. m. parked at the southwest corner of the Allison grocery store, a store located on Buckeye Road some two blocks south of the scene of the crime; (6) the defendant appeared at a service station on South Central Avenue in Phoenix about 2:15 a. m. driving a gray 1947 Plymouth sedan, bearing Arizona license plate number A/H 234, and after purchasing a gallon of gasoline made a telephone call. There was a mention of the word "dad" and the defendant's part of the conversation, which was overheard by the attendant and a merchant patrolman, was: "I done what I told you I was going to. I am sorry. Get mother up and meet me down at Seventh and Broadway."; and (7), the defendant was not to be found the morning of the killing and it was not until three days later, after an intensive man hunt, that he surrendered to the officers, at which time he was accompanied by his attorney. The Plymouth car driven by him the night of the murder was later found hidden in the desert near Estrella, some 18 miles east of the town of Gila Bend and approximately 60 miles southwest of Phoenix in Maricopa county.

The second trial lasted seven days, the first two of which were occupied in selecting a jury. The reporter's transcript covers 1068 typewritten pages. Defendant's opening brief contains 259 pages of which 110 are devoted to setting up some 38 assignments of error, following which are some 30 propositions of law. We shall therefore not attempt to enumerate in this opinion all of the points raised, but after due and careful consideration of every assignment presented, we now confine ourselves to a discussion of only those points which, in our opinion, are deserving of consideration.

### Voir Dire Examination of Jurors.

Defendant predicates several assignments of error on the court's rulings in regard to questions asked certain prospective jurors concerning their attitude toward circumstantial evidence. The questions on the part of the State to which objections were made omitted any reference to circumstantial evidence having to exclude every reasonable hypothesis of innocence before a finding of guilty could be predicated thereon. The questions by defendant were so framed as to emphasize this factor alone. Objections were made by both the State and the defendant at various times, the basis of each objection being that the particular question did not include all of the necessary "elements".

■ In selecting the jury, the court first examined the panel collectively and then counsel examined each prospective juror individually. Practically every one of them was interrogated by both the State and the defendant as to his feelings in regard to circumstantial evidence, and while the questions propounded by counsel were not identical, nor the rulings of the court thereon entirely consistent, yet in our opinion defendant could not possibly have been prejudiced thereby even if we assume that in two or three instances the rulings were erroneous. We say this for the reason that at least six prospective jurors were asked and answered questions concerning circumstantial evidence in which the question contained the statement that such evidence "must exclude every reasonable hypothesis of innocence" without any objection being made thereto. Furthermore, three times during the voir dire examination the court correctly defined to the panel the meaning of circumstantial evidence; instructed them that it was legal and competent evidence, told them how it should be considered, and finally, when the case was submitted to the jury, the court again fully instructed the jury on this matter. No objection is here made to any of the court's final instructions. There is no merit to this group of assignments.

Defendant maintains that the court erred in denying his motion to declare a mistrial because the prospective alternate juror Mildred Emanuel purportedly stated on her voir dire examination, in response to a question as to her acquaintance with the persons involved in the case, "I know all of the people of the girl he killed." The official court reporter recorded the answer as: "I know all her people, they are my neighbors up there." An issue was made of the matter at the time and the court heard counsel in chambers out of the presence of the jury but refused to examine the juror privately. This same matter forms the basis for an assignment on the court's overruling defendant's challenge for cause of said juror (She was later peremptorily challenged and did not serve.), as well as being one of the grounds urged on defendant's motion for a new trial.

We need not consider whether the purported answer was prejudicial for at best there is a mere conflict as to whether the statement complained of was actually made. The court apparently relied upon the official record, as well as his own recollection of what occurred, and we cannot say that in so doing he erred.

### Prosecutor's Opening Statement.

■ The defendant assigns as error a remark the county attorney made in concluding his opening statement to the jury to the effect that the evidence would show that defendant did not, at any time, deny shooting and killing his ex-wife. Defendant contends that under section 44–2704, A.C.A.1939, this is a reference to defend-

ant's failure to testify and constitutes reversible error.

The record discloses that the State, during the course of the trial, did attempt to prove by one of its own witnesses an admission by silence on the part of the defendant. The statement complained of could hardly be construed as even an indirect reference to defendant's failure to take the stand, for at that stage of the proceedings the State could not know whether defendant would or would not testify since he had done so at the previous trial. Under these circumstances it is obvious that only an extremely strained construction of the language could lead to the conclusion that the county attorney's remark was a comment on defendant's failure to testify.

Admission and Exclusion of Evidence.

The defendant objected every step of the way to the introduction in evidence of various exhibits and testimony by which the State laid a foundation for the expert opinion of Ray H. Pinker, technical director of the Scientific Criminal Investigation Laboratory of the Los Angeles police department, whose testimony led to the ultimate conclusion that the Mac Ross gun was the one from which the fatal shots were fired. Nearly half of defendant's assignments of error are directed to the rulings of the court in admitting in evidence not only the expert's opinion but the various exhibits upon which that opinion was based.

Through excellent detective work on the part of the sheriff's office, the State was able to furnish the ballistics expert with certain exhibits, including a fired shell found near the body of the decedent and one lead slug taken from her body. Certain other exhibits, with which comparisons were made, consisted of (1) a box of cartridges taken from the same container in the garage of Jimmie Brown from which came the cartridges for the .22 rifle loaned to the defendant the night of the killing; (2) part of a box of Remington .22 Long Rifle shells taken from the back end of the Mac Ross car, and (3) seven fired shells picked up about May 1, 1948, in the river bed a half mile west of Central Avenue near Phoenix, where Mac Ross testified that he and another had, some three weeks or a month before the killing, engaged in target practice at this same spot with some of the cartridges from the box found in his car and the .22 rifle he later loaned to defendant. Upon comparison of these various exhibits the expert concluded that all of the shots were fired from the same gun.

The ballistics expert, whose qualifications and experience to testify to such matters were fully established, related at length from the witness stand the tests that he had made of the exhibits furnished him. This included all of the known scientific tests employed by technicians in such cases in this specialized field.

The court admitted in evidence highly magnified pictures, or photomicro-

grams, showing firing pin and extractor marks on certain of the fired shell cases in evidence. On the authority of the case of Matthews v. People, 89 Colo. 421, 3 P. 2d 409, the defendant asks the individual members of this court to examine these photomicrograms and find as a fact that the marks on the known and questioned exhibits are dissimilar. This we refuse to do. We are not the triers of fact nor are we qualified by either training or experience to make such a comparison. It is interesting to note in this regard that, so far as we have been able to determine, the Colorado case, in which the members of an appellate court made such comparisons, stands alone in American jurisprudence.

■ Defendant contends that the evidence upon which the expert based his opinion was too remote to be of any probative value and that such evidence was inadmissible as being an inference upon an inference and subjected the defendant to a trial on suspicion, conjecture, and speculation. We believe that the testimony used as a basis for the expert's conclusion was certainly relevant and highly material. The fact that several months elapsed between the target practice when the fired shells were left in the river bottom and their ultimate recovery by the officers goes merely to the weight not the admissibility of the evidence. We are of the opinion that the rules of evidence were fully complied with in admitting these various questioned exhibits and that the trial court did not err in its rulings thereon. The case of State v. Boccadoro, 105 N.J.L. 352, 144 A. 612, presents a comparable factual situation. There the death weapon, which had been stolen by defendant from a Dr. Black, likewise was not found. However the officers had the lead slug which killed the deceased and a bullet which the doctor had fired into the ground some two or three years before, the officers having recovered the latter by digging it up from the doctor's front yard. Ballistics experts were permitted to testify from a comparison of the two that both bullets had been fired from the same gun.

■ Defendant assigns as error the admission in evidence of a statement made by Raymond Rice, the merchant patrolman who also testified as to defendant's telephone call the night of the murder and who identified the car he was driving. The objectionable matter is a statement made by Rice to another after defendant left the station where he purchased gas and made the telephone call, viz:

"Q. Did you (Rice) make any statement after he left? A. Yes, sir, I did.

"Q. What did you say?

"Mr. Stidham: I object to that as hearsay.

"The Court: No, that couldn't be hearsay, could it?

"Mr. Stidham: He said after the defendant left.

"The Court: Overrule the objection.

"Mr. Renaud: Q. Go ahead.

"A. I made a statement to Mr. Williams that I felt there was something wrong and that I should have detained that party."

The ruling, in the light the court obviously took of the matter, was manifestly erroneous. Even though the witness was the declarant, this was an attempt to introduce as substantive evidence, an extrajudicial statement made by the witness at a time when the defendant had no opportunity to cross examine. See State v. Wright, 319 Mo. 46, 4 S.W.2d 456, and cases cited generally under Decennial Digest, Criminal Law, ☞ 419(10)(11). However it can hardly be argued that the admission of this evidence could have prejudiced the defendant, for only a few moments before, on cross examination, D.C. (Pop) Williams, the station operator, had testified to the same thing and defense counsel made no motion to strike it. Hence the statement was already before the jury. Under these circumstances, whether the evidence was admissible on some theory not advanced by the State we need not now determine, for in any event, the later admission of the statement could not have affected any substantial right of defendant.

We pointed out in the case of State v. King, 66 Ariz. 42, 182 P.2d 915, that due to the human equation no case was ever so perfectly tried that it could not be subject to some criticism. This court has consistently held to the view that no case will be reversed because of technical errors which do not affect the substantial rights of the accused. See State v. Thompson, 68 Ariz. 386, 206 P.2d 1037; State v. Hendricks, 66 Ariz. 235, 186 P.2d 943; Riley v. State, 50 Ariz. 442, 73 P.2d 96; Birch v. State, 19 Ariz. 366, 171 P. 135. Prejudice will not be presumed, but must appear probable from the record. State v. Martinez, 67 Ariz. 389, 198 P.2d 115; Lawrence v. State, 29 Ariz. 247, 240 P. 863, certiorari denied 269 U.S. 585, 46 S.Ct. 201, 70 L.Ed. 425.

Due to the fact that the death penalty was inflicted in this case we have most carefully examined the entire record, and while some few errors were committed, they did not, in our opinion, affect the verdict. The defendant was accorded a fair and impartial trial and his guilt was conclusively established.

Judgment affirmed.

STANFORD, PHELPS, DE CONCINI and LA PRADE, JJ., concurring.