302

[No. 62317-1. En Banc.]
Argued November 16, 1995. Decided September 19, 1996.

THE STATE OF WASHINGTON, *Respondent*, v.
WILLIAM MARLIN JONES, *Appellant*.

*Nielsen & Acosta,* by *David B. Koch* and *Eric J. Nielsen; Catherine L. Floit;* and *Mary Jane Ferguson,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Jeffrey B. Baird, Timothy Bradshaw, Cynthia Gannett, James M. Whisman,* and *Regina Cahan, Deputies,* for respondent.

MADSEN, J. — William Marlin Jones appeals a convic-

tion of first degree rape and second degree robbery, primarily arguing that the trial court erred in admitting expert testimony involving the use of DNA identification evidence. We conclude that the DNA evidence was admissible, affirm the conviction, and uphold imposition of an exceptional sentence.

Margaret Hill, a 77-year-old woman who lived alone, was awakened in her home by an intruder standing over her, shining a flashlight in her eyes. The man put his hand over her mouth and demanded, "[w]here is the money, lady?" In fear for her safety, Hill led the intruder to her basement freezer and gave him some money she had hidden there. Clerk's Papers (CP) at 119. After taking the money, the intruder ordered Hill back to the bedroom where he raped her vaginally. During the rape, he again shined the flashlight in her eyes, and said, "It's been a while, hasn't it?" CP at 119. At no time was Hill able to see the man clearly in the light. Hill described her attacker as "a clean-shaven, black male with short hair; five feet, two inches to five feet, three inches; a thin, small man with big eyes and nothing unusual about the eyes." CP at 119.

Police preserved hair and semen samples for forensic analysis. The semen samples and a blood sample taken from Jones were sent to the Federal Bureau of Investigation (FBI) crime lab for deoxyribonucleic acid (DNA) analysis, which determined that Jones's DNA profile matched that of the semen sample taken from Hill on the night of the rape. Dr. Ranajit Chakraborty calculated the chance of another person's DNA profile matching that of the defendant's to be 1 in 1.2 million, using a method called the "interim ceiling principle." CP at 120. Samples of Jones's semen and blood were also sent to the Washoe County Crime Lab. That lab also found a match between the DNA profiles in the semen and blood, and calculated the chance that another person's DNA profile could match that of the defendant's as 1 in 8 million.

The trial court held a *Frye* hearing to determine the

admissibility of the DNA identification testimony. The State called the following witnesses: Audrey Lynch, FBI special agent and the person who interpreted Jones's DNA test results; Richard Gelinas, molecular biologist; Norman Buroker, population geneticist; Ranajit Chakraborty, statistician and human population geneticist; and, as a rebuttal witness, Berch Henry, criminalist of the Washoe County, Nevada, crime lab, who performed the second DNA test. The defense called Randall Libby, molecular biologist; Lawrence Mueller, population geneticist; and Seymour Geisser, statistician. The bulk of expert testimony dealt with the procedures used by the FBI in declaring a match and the statistical methods of calculating a random match probability.

The court ruled the DNA identification evidence admissible because the procedures used by the FBI in declaring a match and the use of the ceiling principle were generally accepted in the scientific community.

Following the *Frye* hearing, Jones waived his right to a jury trial and agreed to a trial on stipulated facts. He was convicted of first degree rape and second degree robbery.

The trial court sentenced Jones to an exceptional term of 280 months. In support of the exceptional sentence, the court found that the victim was a 77-year-old woman who lived alone, and concluded that she was particularly vulnerable and incapable of resistance due to her advanced age. The trial court also found that Jones selected the elderly to victimize.

## DNA Evidence

 Admissibility of novel scientific evidence depends upon whether the evidence sought to be introduced is derived from a scientific theory or principle that "has achieved general acceptance in the relevant scientific community." *State v. Cauthron*, 120 Wn.2d 879, 886, 846 P.2d 502 (1993) (quoting *State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984)). The "general acceptance" test looks to the scientific community to determine whether the evi-

dence in question has a valid, scientific basis. *Cauthron*, 120 Wn.2d at 887. If there is a significant dispute among experts in the relevant scientific community as to the validity of the scientific evidence, it is not admissible. *Id.* at 887. Washington thus follows the *Frye* standard for admissibility, as we have just reaffirmed in *State v. Copeland*, 130 Wn.2d 244, 922 P.2d 1304 (1996). *See Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923). We reject, as we did in *Copeland*, the State's invitation to adopt the standard in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

Initially we note that while the trial court misstated the *Frye* test, the error is not significant, as our review is de novo under the correct standard. *Cauthron*, 120 Wn.2d at 888.

In addition to the materials presented to the trial court, we consider sources outside the record such as scientific literature, law articles, and the decisions of other jurisdictions. *Id.* The relevant inquiry, however, is acceptance by scientists, not by the courts or legal commentators. *Id.* at 888 (citing *People v. Reilly*, 196 Cal. App. 3d 1127, 1134, 242 Cal. Rptr. 496 (1987), *review denied*, March 17, 1988. Once the *Frye* standard is satisfied, the evidence must still satisfy the 2-part inquiry under ER 702. The expert witness must qualify as an expert, and the testimony must be helpful to the trier of fact. *Cauthron*, 120 Wn.2d at 889-90.

▮▮▮▮ Jones challenges the admission of DNA evidence in this case on several grounds. Several of these challenges concern the size, randomness, and quality of the FBI databases, laboratory error and error rates (with issues about proficiency testing involved),[1] and the FBI's use of certain "match windows." We held in *Copeland* that these challenges involve matters of weight and admissibility

---

[1] In this case, the samples were tested by a second laboratory, the Washoe County, Nevada Crime Lab. State witness Berch Henry testified that the Washoe County laboratory is subject to external blind tests and proficiency testing and presently has a tested lab error rate of zero. Report of Proceedings (May 20, 1992) at 13-14.

under ER 702, and not admissibility under *Frye*. Therefore, the trial court in this case did not err when it held the DNA evidence admissible under *Frye* despite these challenges.

Jones also challenges the use of the product rule. In *Copeland*, we held that use of the product rule to obtain statistical estimates of the probability of the frequency of a genetic profile in the population under *Frye*. Jones further argues that the transfer of DNA technology to forensic use from other scientific uses is not generally accepted in the scientific community and, thus, is inadmissible under *Frye*. We rejected this argument in *Copeland*.

Finally, Jones complains that the particular methodology underlying the statistical calculations in this case, the "ceiling principle" and in particular its modified version, the "interim ceiling principle," is not generally accepted in the scientific community. The interim ceiling principle, while based upon the product rule, attempts to account for any possible substructuring in the population, resulting in a number more conservative than that resulting from a calculation based on the product rule alone.

As our decisions in *Cauthron* and *Copeland* disclose, the interim ceiling principle was developed by the NRC Committee to account for the possibility of substructuring in human populations. The methodology was not intended to be scientifically precise, but rather was intended to be ultra-conservative so as to satisfy concerns about substructuring until empirical studies could be undertaken. We concluded in *Cauthron* that because the approach was recommended in the NRC Report, it had gained general acceptance within the scientific community.

Expert witnesses for the State included Dr. Ranajit Chakraborty, a renowned expert in human population genetics, and Dr. Norman Buroker, a population geneticist. They testified that the interim ceiling principle produced an extraordinarily conservative figure.

Defense experts did not raise convincing objections to

the interim ceiling principle. Dr. Lawrence Mueller's primary concern with the interim ceiling principle appeared to be that it was inconsistent to suggest using an arbitrary number of 10 percent as an upper frequency for an allele at a given locus under the interim ceiling principle while performing studies of the 15 to 20 databases for an eventual upper limit of 5 percent under the ceiling principle. Report of Proceedings (RP) (May 7, 1992) at 100-02, 124. *See* NRC Report at 92. However, the NRC Report used the 10 percent figure to account for any *possible* effects of substructuring, and described the decision to use that figure as appropriately conservative until more data could be collected. NRC Report at 92.

Dr. Seymour Geisser testified that use of the methodology must be conditioned on having the FBI database in Hardy-Weinberg and linkage equilibrium. State experts Chakraborty, Buroker, and Dr. Richard Galinas testified that studies have been conducted to show that the FBI databases were sufficiently in Hardy-Weinberg and linkage equilibrium. RP (May 5, 1992) at 20-26; RP (Apr. 27, 1992) at 85, 88; RP (Apr. 28, 1992) at 30-31; RP (Apr. 28, 1992) at 73-83. Numerous published studies confirm this result. *See, e.g.,* Neil Risch & Bernard Devlin, *On the Probability of Matching DNA Fingerprints,* 255 SCIENCE 717 (1992); Bruce Weir, *Independence of VNTR Alleles Defined as Fixed Bins,* 130 GENETICS 873-87 (1992). In contrast, neither Jones nor the expert witnesses called on his behalf were able to cite to published studies to the contrary.

Nearly all the published criticisms of the interim ceiling principle are that it is too conservative or does not squarely address the issue. *See, e.g.,* Bernard Devlin, Neil Risch & Kathryn Roeder, *Statistical Evaluation of DNA Fingerprinting: A Critique of the NRC's Report,* 259 SCIENCE 748, 837 (1993); Peter Aldhous, *Geneticists Attack NRC Report as Scientifically Flawed,* 259 SCIENCE 755 (1993); letter from Bruce Weir to the Editor, *Forensic Population Genetics and the National Research Council (NRC),* 52 AM. J. OF HUM. GENETICS 437 (1992); letter from Bruce Weir & I.W.

Evett to the Editor, *Reply to Lewontin*, 52 AM. J. HUM. GENETICS 206 (1993); *but see* Jennifer R. Slimowitz & Joel E. Cohen, *Violations of the Ceiling Principle: Exact Conditions and Statistical Evidence*, 53 AM. J. HUM. GENETICS 314 (1993) (this article has been criticized as raising theoretical but not practical concerns by Eric S. Lander & Bruce Budowle, *DNA Fingerprinting Dispute Laid to Rest*, 371 NATURE 735 (1994)).

Dr. Eric Lander, who had previously been an outspoken critic of DNA identification evidence, co-authored an article approving use of the ceiling principle. Eric S. Lander & Bruce Budowle, *DNA Fingerprinting Dispute Laid to Rest*, 371 NATURE 735 (1994).

Finally, law articles and the decisions of other jurisdictions also demonstrate that the interim ceiling principle has been used as a conservative method of calculating a random match probability. *See, e.g.*, David H. Kaye, *DNA Evidence: Probability, Population Genetics, and the Courts*, 7 HARV. J.L. & TECH. 101, 168 (1993); Eric E. Wright, *DNA Evidence: Where We've Been, Where We Are, and Where We Are Going*, 10 ME. B.J. 206 (1995). As in the scientific literature, most of the criticism of the interim ceiling principle is that it is too conservative and that accounting for subpopulations is unnecessary. Kaye, *supra*; Wright, *supra*.

Courts in other jurisdictions which have addressed the issue have overwhelmingly approved use of the ceiling and interim ceiling principles. Many are *Frye* jurisdictions. *See, e.g., Harmon v. State*, 908 P.2d 434 (Alaska Ct. App. 1995); *State v. Johnson*, 183 Ariz. 623, 905 P.2d 1002 (Ct. App.), *aff'd* 186 Ariz. 329, 922 P.2d 294 (1996); *State v. Streich*, 658 A.2d 38 (Vt. 1995); *State v. Vandebogart*, 139 N.H. 145, 652 A.2d 671 (1994).

Considering the scientific literature, the expert testimony in this case, and the conclusions of other jurisdictions, the overwhelming view is that while the interim ceiling principle is artificially conservative, it has been accepted for what it is, i.e., a method for calculating prob-

abilities which was biased in favor of defendants in order to compensate for any possible effect due to substructuring in human populations.

The National Research Council formed a new committee to update and clarify principles concerning population genetics and statistics as applied to DNA evidence. The committee has issued a prepublication copy of its report. COMMITTEE ON DNA FORENSIC SCIENCE: AN UPDATE, THE EVALUATION OF FORENSIC DNA EVIDENCE (National Academy Press 1996) (Prepublication Report). The prepublication report concludes that "the abundance of data in different ethnic groups within the major races and the genetically and statistically sound methods recommended in this report imply that both the ceiling principle and the interim ceiling principle are unnecessary." Prepublication Report at 5-35.

Use of the interim ceiling principle will likely decline nationally following issuance of the final report, and in Washington it will likely be abandoned given our holding in *Copeland* that use of the product rule is admissible in calculating frequency probabilities. Despite the new committee's rejection of the interim ceiling principle, however, we see no reason to require retrial of defendants solely on the ground that the interim ceiling principle was used to calculate probabilities. Not only has the method been widely accepted, given its admitted limitations, but a defendant who has benefited from its use is in no position to complain given our approval of the product rule, which is generally less favorable to a defendant.

<u>Exceptional Sentence</u>

█ Jones argues that the trial court improperly relied on prior crimes and one uncharged crime in arriving at its finding that he targets the elderly to victimize. We do not address this contention, however, because we uphold the exceptional sentence on the trial court's stated legal basis of the victim's vulnerability due to advanced age. It is irrelevant whether the trial court's other finding of fact,

that Jones selects the elderly to victimize, is supported by the record because the trial court did not enter any legal conclusion regarding that finding and thus the finding could not have supported an exceptional sentence in any event.

Under RCW 9.94A.390(2)(b), an aggravating factor supporting an exceptional sentence is that the defendant "knew or should have known that the victim . . . was particularly vulnerable or incapable of resistance due to . . . advanced age." The trial court found that the victim was a woman who was 77 years old. The evidence supports this finding. Further, Jones knew or should have known of the victim's advanced age because he had ample opportunity to observe the victim: Hill told the police that Jones woke her by shining a flashlight into her eyes, that he led her to the basement to retrieve the money, that they then returned to her bedroom where he again shined the flashlight into her face while he raped her, and that he said, while raping her, that "[i]t's been a while, hasn't it?" CP at 119.

We hold that the evidence supports the trial court's imposition of an exceptional sentence based upon the victim's vulnerability due to advanced age. *See State v. George*, 67 Wn. App. 217, 221-22, 834 P.2d 664 (1992) (stating that vulnerability due to advanced age may alone, as a matter of law, justify an exceptional sentence in robbery, assault, and rape of 77-year-old woman), *review denied*, 120 Wn.2d 1023, 844 P.2d 1018 (1993), *overruled on other grounds by State v. Ritchie*, 126 Wn.2d 388, 395, 895 P.2d 1308 (1995) and *State v. Cardenas*, 129 Wn.2d 1, 129 P.2d 57 (1996); *State v. Clinton*, 48 Wn. App. 671, 676, 741 P.2d 52 (1987) (fact that rape victim was 67 years old established that she was particularly vulnerable due to advanced age).

Affirmed.

DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, ALEXANDER, and TALMADGE, JJ., and PEKELIS, J. Pro Tem., concur.